1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Danielle Ann Marie Perez,              )   No. CV-13-0218-TUC-BGM
                                           )
10              Plaintiff,                  )
                                           )
11  vs.                                    )   **ORDER**
                                           )
12  Carolyn W. Colvin,                     )
    Acting Commissioner of Social Security, )
13                                         )
                Defendant.                 )
14  _____   )

15          Currently pending before the Court is Plaintiff's Opening Brief (Doc. 25).  Defendant

16  filed her response (Doc. 30), and Plaintiff replied (Doc. 33).  Plaintiff brings this cause of

17  action for review of the final decision of the Commissioner for Social Security pursuant to

18  42 U.S.C. § 405(g).  The United States Magistrate Judge has received the written consent of

19  both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal

20  Rules of Civil Procedure.

21

22  **I.      BACKGROUND**

23          *A.      Procedural History*

24          On March 16, 2011, Plaintiff filed an application for Social Security Disability

25  Insurance Benefits ("DIB") and on July 21, 2009 filed an application for  Supplemental

26  Security Income ("SSI") alleging disability as of July 1, 2009 due to multiple hereditary

27

28

1   exostoses and a broken femur as a result of a motor vehicle accident.[1]  *See* Administrative

2   Record ("AR") at 14, 90, 115, 126, 137, 145, 916-17.  The Social Security Administration

3   ("SSA") denied this application on December 17, 2009.  *Id.* at 26, 32-35.  On February 10,

4   2010, Plaintiff filed a request for reconsideration, and on April 21, 2010, SSA denied

5   Plaintiff's request.  *Id.* at 27, 36-42.  On June 20, 2010, Plaintiff filed her request for hearing.

6   *Id.* at 45.  On March 16, 2011, a hearing was held before Administrative Law Judge ("ALJ")

7   Lauren R. Mathon at which time Plaintiff's counsel moved to amend the Title XVI

8   application to include the Title II application.  *Id.* at 917, 975-85.  In light of this amendment,

9   the ALJ continued the hearing.  *Id.* at 984.  On May 9, 2011, a second hearing was held

10  before ALJ Mathon.  AR at 914-74.  The ALJ issued a partially favorable decision on June

11  16, 2011.  *Id.* at 10-23.  Plaintiff was awarded Title XVI SSI benefits as of December 27,

12  2009, but the ALJ found Plaintiff was not disabled prior to December 27, 2009.  *Id.*  On

13  August 12, 2011, Plaintiff requested review of the ALJ's decision by the Appeals Council,

14  and on February 6, 2013, review was denied.  *Id.* at 2-9.  On April 1, 2013, Plaintiff filed this

15  cause of action.  Compl. (Doc. 1).

16      **B.    Factual History**

17      Plaintiff was twenty-six (26) years old at the time of the administrative hearing, and

18  twenty (20) at the time of the alleged onset of her disability.[2]  AR at 24, 26, 27, 87, 90, 102,

19  122, 134, 143, 925.  Plaintiff is a high school graduate.  *Id.* at 120, 538, 928.  Prior to her

20  alleged disability, Plaintiff worked intermittently in fast food and retail.  *Id.* at 98-100, 116,

21  151-52.  Since 2006, Plaintiff worked for short periods at Pizza Hut, Plaza Del Sol Security,

22

23      [1]On May 2, 2007, Plaintiff filed a Title XVI SSI claim alleging disability as of March 30,

24  2006.  AR at 87.  Additionally, Plaintiff's Title II DIB claim alleged disability as of March 30, 2006, with a date of last insured as of March 31, 2006.  *Id.* at 917, 979, 981.

25

26      [2]Plaintiff is seeking review of the ALJ's denial of benefits prior to December 27, 2009.  *See*

27  Pl.'s Opening Br. (Doc. 25).  As such, for purposes of this Order, the alleged onset of disability is March 30, 2006.

28

1  and Macto Security.  *Id.* at 98-99, 105, 539, 929-31.  More recently, Plaintiff has looked for
2  work, but was never hired.  *Id.* at 932.

3      **1.  Plaintiff's Testimony**

4      At the administrative hearing, Plaintiff testified that she currently lives with her
5  husband and six (6) year old daughter.  AR at 926.  Plaintiff further testified that a friend
6  stays with them, although not consistently, and helps her around the house and with her
7  daughter while her husband works.  *Id.* at 926-28.  Plaintiff also testified that she, her
8  husband, and daughter previously lived with her mother, father, and younger brother.  *Id.* at
9  929.  Plaintiff testified that she does not have a driver's license and relies on others to drive
10  her, but does not take public transportation.[3]  *Id.* at 933.  Since March 2006, Plaintiff testified
11  that she has only left Tucson once on a trip with her father to visit family in Sacramento,
12  California.  *Id.* at 933-34.  Plaintiff further testified that her father did all of the driving to and
13  from California.  *Id.* at 934.

14      Plaintiff testified that she has multiple hereditary exostoses ("MHE") or
15  osteochondromatosis and was recently diagnosed as bipolar, having been previously
16  diagnosed when she was a child as manic-depressive.  AR at 936.  Plaintiff further testified
17  that she has had four surgeries as a result of the MHE, one on her left leg when she was
18  eleven (11) years old; one on her right shoulder when she was twelve (12); one on her left
19  shoulder when she was thirteen (13); and one on her right wrist when she was fourteen (14).
20  *Id.* at 936-39.  Plaintiff also testified that she had a fifth surgery on her right femur, as a result
21  of 2009 motor vehicle accident, in which a titanium rod was placed from her hip to her knee.
22  *Id.* at 939.  Plaintiff testified that she suffered kidney failure after the automobile accident.
23  *Id.* at 940-41.  Plaintiff further testified that she has arthritis in her hands due to the MHE.
24  *Id.* at 941.  Plaintiff further testified that as a result she cannot type for very long, because

25
26
27      [3]Plaintiff could not remember what kind of tickets she was unable to pay that were involved
   in the loss of her license.  AR at 948.

28      - 3 -

1   her "fingers will stiffen and lock up."  AR at 941.  Plaintiff also testified that she is "unable

2   to actually grip what needs to be gripped to open like a peanut butter jar or a can, [or] bottle."

3   *Id.* at 941-42.  Plaintiff testified that as a result she can only type for a few minutes at a time,

4   and draw for approximately five (5) minutes.  *Id.* at 942.  Additionally, Plaintiff testified that

5   how fast her fingers stiffen is also dependant upon the temperature.  *Id.*

6          Plaintiff testified that she began using a wheel chair after she left the hospital

7   following the December 2009 motor vehicle accident.  *Id.* at 934-35.  Plaintiff also testified

8   that she "tried using a walker[,] [but] . . . [she] just use[s] the wheelchair when [she] go[es]

9   out of the house to places that might require lots of walking."  AR at 936, 942.  Plaintiff

10  further testified that if it is "a place that doesn't require a lot of walking, then I try to do my

11  best to do as much as I can to keep my legs at least moving."  *Id.* at 942.  Plaintiff testified

12  that she is "not supposed to be moving around too much[,] [she is] actually supposed to be

13  elevating [her] leg."  *Id.* at 942-43.  Plaintiff further testified that both legs swell, and she

14  tries to keep them elevated for "about three to four hours a day."  *Id.* at 943.  Her legs have

15  swollen since she was a child, but prior to the accident she did not need to elevate her legs

16  as often or as long.  *Id.* at 945.  Plaintiff testified that prior to the accident she would elevate

17  her legs for approximately one (1) hour, once per week.  AR at 945.  Plaintiff also testified

18  that she "can't really keep [her leg] in the same position too long, otherwise it will also lock

19  up."  *Id.* at 943.  Plaintiff testified that her ability to walk and stand is dependant upon the

20  weather and temperature, and before the accident she could walk approximately a half mile;

21  however, now she can only walk for approximately five (5) minutes.  *Id.* at 943-44.  Plaintiff

22  further testified that when her legs are fatigued, she falls.  *Id.* at 944.  Plaintiff testified that

23  prior to the accident she was able to stand for approximately twenty (20) minutes, but she can

24  only stand for a few minutes now, and "usually that's when [she is] holding onto either a wall

25  or somebody's arm or the arm of the couch."  *Id.* at 944-45.

26          Plaintiff testified that "[e]very job [she] had, [she has] either had to quit because of

27  the limitations that [she has] had to endure, or because [she] was fired for not being able to

28                                                      - 4 -

1    live up to their standards[,]" meaning she was unable "to do the job in a timely manner." AR

2    at 946.  Plaintiff does not remember being fired for any other reasons. *Id.* at 946.  Plaintiff

3    further testified that she only earned minimal wages, because she did not earn raises beyond

4    her starting salary. *Id.*  Plaintiff also testified that she was unable to stand for the period of

5    time required while working, and had falls as a result of her MHE. *Id.* at 945-47.

6         Plaintiff testified that she was recently diagnosed bipolar, but prior to that she had

7    been diagnosed as a manic-depressive. *Id.* at 947.  Plaintiff further testified that she suffers

8    from depression that takes "days to weeks to get out of" and she would become very

9    emotional, show signs of fatigue, would not eat and could not sleep. *Id.*  Plaintiff testified

10   that this has been going on since she was approximately four (4) years old. *Id.*  Plaintiff

11   began seeing a psychiatrist when she was seven (7); however, the psychiatrist told her

12   parents things that he had told Plaintiff that she "could tell him in secrecy." AR at 947.  As

13   a result Plaintiff "stopped trusting psychiatrists and . . . stopped seeing them until recently"

14   when she was seen at CODAC. *Id.*  Plaintiff testified that in the work setting, her mental

15   problems caused her "to feel like [she] couldn't do the job required of [her]." *Id.*  Plaintiff

16   also testified that she "started feeling like no matter what [she] did, [she] could never get out

17   of the hole [she] felt like [she] was in." *Id.*

18        Plaintiff testified that she had one seizure as a result of running out her medication

19   after she lost her AHCCCS. AR at 948.  Plaintiff further testified that some days she does

20   not fall at all, but other times she might "fall four or five times in a day." *Id.* at 949.  Plaintiff

21   also testified that "[b]efore 2006, [she] fell maybe one or two times every couple of weeks

22   to three weeks." *Id.*  Since that time her bone condition has worsened. *Id.*  Plaintiff testified

23   that since she was eleven (11) years old, she has taken Vicodin, Valium and ibufprofen. *Id.*

24   at 119, 950; *see also* AR 519.  The ibuprofen is for the swelling, Valium for anxiety and as

25   a muscle relaxer and Vicodin for the pain. AR at 119, 950.  Plaintiff testified that as a result

26   of these medications, she usually feels tired and rundown. *Id.* at 951.  Plaintiff further

27   testified that as an adult she would receive prescriptions for these medicines from either the

28                                          - 5 -

1    "emergency room or from the doctor that [she] happened to see at that time, [who] would

2    prescribe it to [her] because of [her] past history[.]" *Id.*

3         Plaintiff testified that she had one other car accident that occurred when she was

4    pregnant with her daughter in 2004. *Id.* at 951-52. Plaintiff further testified that the accident

5    was a result of two blow-out tires. *Id.* at 951. Plaintiff testified that she stopped driving

6    within the three (3) years prior to the hearing. AR at 953.

7         Plaintiff testified that she has "ten calcium deposits along [her] spine[,] . . . three in

8    [her] pelvis bone[,] [her] knees and [her] ankles, [her] toes, [her] shoulders, [and] the back

9    of [her] neck." *Id.* at 953. Plaintiff further testified that as a result of these deposits " if it's

10   really cold then [she] [can] barely move at all." *Id.* Plaintiff also testified that "[i]f it's really

11   hot, then [she is] just really sluggish." *Id.* at 953-54. Plaintiff testified that she "can't bend

12   very well at all." *Id.* at 954. Further, "[t]he swelling occurs because of calcium deposits in

13   [her] left leg." AR at 954. Plaintiff also testified that if her "muscles get pinched . . . [she]

14   end[s] up in a lot of pain." *Id.* at 954-55.

15        Plaintiff testified that her friend and her husband do the housework, and her daughter

16   does her own chores. *Id.* at 955. Plaintiff further testified that her neighbor, who is like a

17   second mother, helps by doing the cooking and helping her daughter get ready for school,

18   and takes care of her when Plaintiff is unable to do so.[4] *Id.*

19        Plaintiff testified that she had to go to a class at Child Protective Services ("CPS"),

20   but she was unable to complete it. *Id.* at 958. Plaintiff further testified that this occurred as

21   a result of neighbors calling CPS when her daughter had night terrors. *Id.* at 959. Plaintiff

22   further testified that at the time of the alleged incident their belongings were in boxes,

23   because they were in the process of moving, and her daughter had strewn some of the items

24   around causing disarray. *Id.* When the police arrived, they did not believe Plaintiff when

25   _____

26        [4]In her decision, the ALJ improperly found that Plaintiff's daughter was home schooled. AR
     at 18. Plaintiff testified that she taught her daughter at home prior to kindergarten, but not in any
27   formal way. *Id.* at 955-56.

28                                              - 6 -

1   she explained that her daughter was having night terrors.  *Id.*  Plaintiff tried to take the class

2   a second time, but was told that they had lost the paperwork.  *Id.* at 959.  As a result, a

3   warrant issued.  *Id.*

4   ## 2.  Lay Witness Victor Browning's Testimony

5   Plaintiff's husband Victor Browning also testified at the administrative hearing.  AR

6   at 960.  Mr. Browning testified that they were married on January 22, 2008, and have lived

7   together since 2006.  *Id*.  Mr. Browning further testified that he met Plaintiff on June 19,

8   2006.  *Id.* at 962.  Mr. Browning also testified that he adopted Plaintiff's daughter and has

9   no other children.  *Id.* at 961.  Mr. Browning testified that he works as an automotive

10  technician.  *Id.* at 961.

11  Mr. Browning described Plaintiff as having "issues" when they first met, including

12  falling down occasionally, protrusions, being unable to lift her arm above her shoulder, and

13  "days where she had a lot of pain and couldn't do much[.]"  AR at 962-63.  Mr. Browning

14  further testified that "it's progressively gotten worse since then."  *Id.* at 963.  Mr. Browning

15  testified that he "open[s] everything[,] . . . [and] do[es] all the lifting."  *Id*.  Mr. Browning

16  further testified that Plaintiff

17       can't lift a lot.  Her dexterity is not that great.  Her hand strength is not very
         good at all, so opening jars, no, even using a manual can opener is not – she
18       can't really do that, either.  Like I said, as far as lifting goes, I don't know she
         could probably do five/ten pounds once or twice, but that's about it.
19
20  *Id.*  Mr. Browning further testified that since 2006, the Plaintiff's pain

21       [j]ust . . . adds – the pain adds up.  The more she moves around, the more she
         uses her hands or shoulders or legs or whatever, the calcium deposits irritate
22       the muscles that it's pushing on and the nerve endings, and the pain – so the
         more she moves, the more inflamed and the more pain she experiences.

23  *Id.*  Regarding Plaintiff's activities of daily living, Mr. Browning testified that in 2006

24  Plaintiff "could go to the bathroom for herself; she could, you know, play with her daughter

25  a little bit; she could go to the kitchen; she could cook a little bit; she could go outside for a

26  while; she could, you know, she could handle stairs as long as she had the railing."  *Id.* at

27  964.

28

1    Mr. Browning testified that Plaintiff has tried to have various jobs since they were

2    together.  AR at 964-65.  Mr. Browning further testified that "the first couple of weeks

3    always goes well and then, after that, you know, she had – all the moving around adds up,

4    her body can't keep up."  *Id.* at 965.  Mr. Browning also testified that he would "wind up

5    taking her to the emergency room because she just gets to the point where she can't move."

6    *Id.*  Mr. Browning testified that as a result, Plaintiff "[m]isses work, [and] that's ultimately

7    why they let her go is because she had to call in."  *Id.*  Mr. Browning further testified that

8    "[t]he most hours that she could do on any kind of a reliable basis, I guess you could say,

9    would be 15 hours a week, which didn't even cover the daycare that was needed for our

10   daughter to be – for her to be able to work."  *Id.*  Mr. Browning also testified that Plaintiff's

11   "ankles dislocate really easily, so if she steps wrong, you have to take her in to get her ankle

12   reset."  AR at 965.  Mr. Browning testified that an employer "had to be careful about where

13   they put her, because . . . she would fall . . . [and] the boss was always angry with her

14   because she shows up a little bit late because she has a hard time getting going . . .

15   [including] a hard time getting dressed [without help]."  *Id.*

16   Mr. Browning testified that Plaintiff "can't really do any one thing for very long."  *Id.*

17   at 966.  Mr. Browning also testified that Plaintiff "loves to draw and she loves to type and

18   she love to be on the computer but, you know, a half-hour, 45 minutes, her fingers are

19   cramping up, her wrists are hurting, so she has to wait for a while for that."  *Id*.  Mr.

20   Browning further testified that Plaintiff "can't stand and walk for long distances and, at the

21   same token, she can't sit down for very long."  *Id.*

22   Mr. Browning testified that on good days, Plaintiff will do a little bit more, but "she

23   tends to overdo herself and then she can't do anything for the next week."  AR at 966.  Mr.

24   Browning testified that inside the house "she's always got a wall or there's a piece of

25   furniture she can lean on[,] [but] . . . outside, one little misstep and she's going to fall and

26   she's going to hit her knee, and then it's going to be swollen for four days, if we're lucky."

27   *Id.* at 967. Mr. Browning also testified that Plaintiff's "ankles have had to be reset a couple

28

of times because on her right foot, I believe, the calcium deposits interfere with the joint, to the point that if she shifts her weight wrong or steps on it wrong, it will pop out of socket and it has to be put back in." *Id.*

Mr. Browning testified that when they go to the grocery store, Plaintiff does not use the wheelchair, but he drops her at the front door where she can get to the motor cart, and he will park the car and meet her. *Id.* at 967. Mr. Browning testified that Plaintiff did "use a walker for a little while[,]" but it was heavy and "a lot of strenuous work on her shoulders, and so those didn't work out very well for her, either." *Id.* at 967-68. Mr. Browning also testified that Plaintiff was unsuccessful using a cane. AR at 968. Mr. Browning testified that when they were first together, Plaintiff's good days and bad days were "probably about even, you know, she'd have a good day, she'd have a bad day, she'd have a good day, she'd have a bad day." *Id.* at 968.

Mr. Browning further testified that Plaintiff's "license was suspended because of some fines back when [they] first got together." *Id.* Mr. Browning also testified that "the reason that those fines haven't been paid is, well, financial reasons." *Id.* at 968. Mr. Browning testified that Plaintiff "can't drive a car anyway." *Id.* at 969. Mr. Browning further testified that Plaintiff "can't push the brake hard enough." AR at 969.

Mr. Browning testified that the warrant for Plaintiff came about because their daughter would through fits and tantrums when it was time for bed, "and the neighbors were convinced that [he] was beating [their] daughter, so they would have the cops come and respond[.]" *Id.* at 970. Mr. Browning further testified that "all of [their] stuff was packed up in the apartment . . . [and] a few of the boxes got knocked over, things got spilled out of them, [their] daughter went through a few things . . . [a]nd, so, when she threw a tantrum, the cops came over again, the house was a mess, and so the charge that they gave [them] was, it's like contributing to the delinquency of a minor." *Id.* at 970-71. Mr. Browning testified that they "tried to go down there" to take the required course, but "[t]hey wouldn't let [Plaintiff] eat[,] and [i]t wasn't very accessible for her[,] [t]hey required her to walk around

a lot[,] [i]t wasn't really good for having wheelchairs there[,] [a]nd she needed to have someone there and I'm always working, so." *Id.* at 971.

Regarding the housework, Mr. Browning testified that their "daughter does her chores and . . . [he] usually come[s] home and . . . do[es] a lot of the chores [him]self after [he] come[s] home from work." *Id.* Mr. Brown further testified that they have a friend who "needed a place to stay, so [he] pay[s] for her room and board and she stays and helps when [he] [is] at work." AR at 971. Mr. Browning also testified that "[s]he gets [their] daughter to school, picks [their] daughter up when [their] daughter's off, makes sure that [their] daughter has . . . breakfast at school, but makes sure that she has a snack when she gets home, and then if [he] has to work late, dinner." *Id.* at 971-72. Mr. Browning testified that their friend's son, Victor, also helps out by assisting with repairs around the house. *Id.* at 972. Mr. Browning opined that based on past experience, he did not think Plaintiff could have a job. *Id.* at 973. Mr. Browning testified that "[e]very couple of days she's going to be in too much pain to get up, and if she falls at work, she's going to have to go to the hospital immediately because of the swelling, it creates another calcium deposit, knocks a joint out of – dislocates a joint, so, no, I don't think she could hold a job." *Id.*

### 3.  Plaintiff's Pre-December 2009 Medical Records

On January 23, 2004, Plaintiff was seen in the emergency department of Carondelet Health Network at St. Mary's Hospital for strep throat. AR at 566-67. She was seen again on June 5, 2004 for "mild conjunctival erythema bilaterally[.]" *Id.* at 568-69. On June 8, 2004 Plaintiff was seen for "right flank pain[,]" but denied any further pain secondary to her MHE. *Id.* at 570-77. Plaintiff was treated for a urinary tract infection and possible kidney infection. *Id.* at 571. Early osteoarthritic changes were suggested in an x-ray of her hand, as well as other osseous masses on her left humerus, scapula, and possibly on her rib, taken the same day. *Id.* at 576-77. On July 17, 2004, Plaintiff was seen in the emergency department of Carondelet Health Network at St. Joseph's Hospital and treated for a kidney infection with a positive pregnancy test. AR at 672-79. Asthma, MHE, and hypoglycemia

1    were consistently noted in the records.  *See id.* at 566-77, 672-79.  On March 21, 2005,

2    Plaintiff was admitted to the University Medical Center ("UMC"), and gave birth to her

3    daughter.  *Id.* at 601-03, 874-84.

4         On the evening of August 31, 2006 and into the morning hours of September 1, 2006,

5    Plaintiff was seen at the urgent care of UMC for multiple joint pain including her neck, back,

6    and wrist.   *Id.* at 597-600, 637-58, 870-73.  Radiographs indicated osteochondromas

7    throughout Plaintiff's skeleton.  *Id.* at 638-51.  On September 7, 2006, Plaintiff was again

8    seen for low back, neck, and left shoulder pain, and further x-rays were taken of her hip,

9    pelvis, knee and back.  AR at 593-96, 610-36, 867-69.  These further indicated multiple

10   osteochondromas throughout Plaintiff's skeleton.  *Id.*  On November 27, 2006, Plaintiff was

11   seen in the emergency department at UMC for wrist, ankle and back pain.  *Id.* at 590-92, 863-

12   64.  On December 1, 2006, Plaintiff was again seen for prescription refills and chronic pain.

13   *Id.* at 588-89, 860-62.

14        Plaintiff returned to the UMC emergency department on February 3, 2007,

15   complaining of pain in ankles, leg, wrist, back, and neck.  *Id.* at 586-87, 857-59.  Plaintiff's

16   records consistently indicate MHE, hypoglycemia, and asthma.  *See* AR at 586-658, 854-59.

17   May 14, 2007, Plaintiff was again seen in the UMC emergency department complaining of

18   ankle, leg wrist, back and neck pain.  *Id.* at 854-56.  On August 25, 2007, Plaintiff was seen

19   in the emergency department at Carondelet Health Network, St. Joseph's Hospital

20   complaining of bilateral flank pain.  *Id.* at 670-71, 680-83.  Plaintiff was treated for a kidney

21   infection.  *Id.* at 671.  On September 20, 2007, Plaintiff was seen in the emergency

22   department of Carondelet Health Network for hip pain after a fall the previous week.  *Id.* at

23   666-69.  X-rays showed osteochondromas on her pelvis and femur.  AR at 666-69.  On

24   December 20, 2007, Plaintiff was again seen in the emergency department of Carondelet

25   Health Network and diagnosed with a urinary tract infection.  *Id.* at 662-65.  Plaintiff's

26   records consistently indicate MHE, hypoglycemia, and asthma.  *See id.* at 662-71,

27        On March 9, 2008, Plaintiff was seen in the emergency department at UMC after a

28                                        - 11 -

fall. *Id.* at 851-53. On March 14, 2008 was again seen in the emergency department at UMC with flu-like symptoms, diagnosed as a urinary tract infection. *Id.* at 580-85, 845-50. "Diffuse tenderness to palpation at upper and lower extremity joints" was noted. AR at 580-85. "[M]ultiple osteochondromas throughout [her] skeleton" were also noted on x-ray. *Id.* at 584, 606, 608, 849. On May 21, 2008, Plaintiff was seen in the emergency department of the Carondelet Health Network for a swollen right eye. *Id.* at 659-61. On October 8, 2008, Plaintiff was seen in the emergency department at University Medical Center for throat pain. *Id.* at 163-68, 841-44. A throat culture was performed and Plaintiff was treated for an upper respiratory infection. *Id.* On February 16, 2009, Plaintiff was seen in the emergency department at Carondelet Health Network right hand and wrist pain due to hitting a window. AR at 175-78. X-rays of Plaintiff's right hand and wrist were taken, and no acute fracture found. *Id.* at 176, 178. Periarticular osteopenia and osteochondroma were noted. *Id.* at 178.

On the evening of June 23, 2009 and into June 24, 2009, Plaintiff was again seen in the emergency department of University Medical Center for "[c]hronic pain exacerbation[,] Multiple hereditary exostoses[,] [and] [f]atigue, likely secondary to chronic disease." *Id.* at 159-62; 837-40. The records indicate that Plaintiff had "chronic right hip pain, chronic low back pain, chronic bilateral shoulder pain that is all secondary to her underlying disease." *Id.* at 159, 837. Plaintiff's previous medications included ibuprofen, Vicodin, Valium, and albuterol inhaler. AR at 159, 837. A review of her musculoskeletal system and extremities was "[s]ignificant for multiple bony swelling, including left proximal humerus, left distal femur." *Id.* at 161. "These prominences are mildly tender to palpation . . . [and] are chronic and unchanged over the last several months. *Id.* Plaintiff had "5/5 strength in upper and lower extremities[,] [but] [s]houlder range of motion is limited in flexion to approximately 45 secondary to these masses." *Id.* at 161. Plaintiff's "fingers also demonstrate[d] bony deformities; however, sensation and strength are intact throughout." *Id.* Plaintiff was "provided with prescription for her chronic pain, including Vicodin and Valium with which she has previously been treated successfully[,] [and] . . . a one-time prescription for her

1    albuterol inhaler[.]" AR at 161.

2          On July 20, 2009, Plaintiff was seen in the emergency department of Carondelet

3    Health Network. *Id.* at 170-74. Plaintiff reported that she was "having increasing pain in the

4    lower spine and bilateral hips most significantly on the right and over the past 3 weeks ha[d]

5    been having difficulty ambulating and bearing her own weight." *Id.* at 170. Plaintiff further

6    reported "weakness, which she feels in both of her legs[.]" *Id.* Plaintiff also reported that

7    she had "been using a wheelchair for the past three weeks to move about[,] the wheelchair

8    she has borrowed from her brother who carries the same disease." *Id.* X-rays of the lumbar

9    spine and hip were obtained, and multiple bony protuberances were apparent on her pelvis.

10   AR at 171, 173.

11         On August 11, 2009, Plaintiff was seen at University Physicians Healthcare ("UPH")

12   Alvernon Family Medicine Center ("Alvernon") to establish care. *Id.* at 513-14. Plaintiff

13   reported "many problems that have gone neglected due to inability to obtain insurance." *Id.*

14   at 513. In addition to her previous medications, she was given Diazepam, citalopram, and

15   zolpidem for her depression/anxiety and to help her sleep. *Id.* at 514. On August 13, 2009,

16   Plaintiff went to the Arizona Department of Health Services Division of Behavioral Health

17   Services ("ADHS-DBHS") to begin mental health treatment. *Id.* at 515-44. Plaintiff's

18   history included her early manic-depressive diagnosis, several assaults, and ongoing anger

19   and trust issues. AR at 524, 527, 544. On August 31, 2009 Plaintiff followed-up at UPH

20   Alvernon regarding pain secondary to her MHE and depression. *Id.* at 510-12.

21         On September 2, 2009, Andres Kerns, Ph.D. reviewed Plaintiff's medical records and

22   completed a Psychiatric Review Technique. *Id.* at 179-91. Dr. Kerns indicated that there

23   was insufficient evidence for a medical disposition. *Id.* at 179. Pursuant to request by the

24   Arizona Department of Economic Security ("AZDES"), Plaintiff was examined by Enrique

25   Suarez, M.D. *Id.* at 193-95. Dr. Suarez noted that Plaintiff's "right shoulder, right elbow,

26   and right wrist [are] normal and she has significant deformities of all the fingers of the right

27   hand and also of the left hand[,] [and] [s]he had a scar on the left shoulder and she cannot

28

1   elevate it more than 90 degrees." AR at 194.  Dr. Suarez further noted that "ambulation was

2   assisted with a wheelchair" and that Plaintiff "appeared to be very depressed[.]"  *Id.*  On

3   September 28, 2009, Plaintiff was seen again at UPH Alvernon with depression and chronic

4   pain related to her MHE.  *Id.* at 502-04.  At that time she was still taking Diazepam and

5   citalopram for her mental health issues.  *Id.*

6

7                       **II.     STANDARD OF REVIEW**

8          The factual findings of the Commissioner shall be conclusive so long as they are

9   based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3);

10  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the

11  Commissioner's denial of disability insurance benefits when the ALJ's findings are based

12  on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*

13  *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

14         Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

15  preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

16  873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098.  Further, substantial evidence is

17  "such relevant evidence as a reasonable mind might accept as adequate to support a

18  conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can

19  support either outcome, the court may not substitute its judgment for that of the ALJ."

20  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992));

21  *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may

22  not focus on an isolated piece of supporting evidence, rather it must consider the entirety of

23  the record weighing both evidence that supports as well as that which detracts from the

24  Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

25

26  **III.    ANALYSIS**

27         The Commissioner follows a five-step sequential evaluation process to assess whether

28                                          - 14 -

a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2006, and was not engaged in substantial gainful activity since March 30, 2006.  AR at 16.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following medically determinable impairments: exostosis, depression, bipolar disorder, and asthma (20 CFR 404.1521 *et seq.* and 416.921 *et seq*)."  *Id.*  Prior to December 27, 2009, however, the ALJ found that Plaintiff "did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq*. and 416.921 *et seq.*)."  *Id.* at 16-17, 20. Accordingly, regarding Plaintiff's pre-December 27, 2009 claims, the ALJ found Plaintiff to be not disabled at Step Two.  *See id.* at 16-20.  Plaintiff asserts that the ALJ erred in failing to properly evaluate 1) the opinions of Plaintiff's physicians; 2) the opinions of lay persons; and 3) Plaintiff's credibility.  Pl.'s Opening Brief (Doc. 31) at 11-16.  Plaintiff further asserts that the ALJ should have used a vocational expert in assessing Plaintiff's ability to work.  *Id.* at 16-20.

1

### A.     Step Two Non-Severity Finding

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).  The claimant bears the burden to show medical evidence consisting of signs, symptoms, and laboratory findings to establish a medically determinable physical or mental impairment.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005); 20 C.F.R. §§ 404.1512, 404.1520; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

"[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54, 107 S.Ct. 2287, 2297-98, 96 L.Ed.2d 119 (1987)).  "An impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290 (emphasis added)).  "[O]nce a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc)) (alterations in original).  Moreover, "[t]he ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Id.* (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).

Here, the ALJ found "claimant's alleged limitations are not corroborated by the objective medical evidence prior to the date last insured[,] . . . [and her] medical treatment has been limited to emergency room visits for complaints unrelated to her medically determinable impairment." AR at 18.  The ALJ  provided a brief summary of some of the

1    medical care received by Plaintiff, concluding that "[c]laimant's level of functioning is

2    inconsistent with her alleged limitations." *Id.* The ALJ based her credibility determination

3    on these alleged issues, as well as on Plaintiff's alleged failure to treat her mental disorders,

4    and a dismissal of the consultative examiner's opinion. *Id.* at 18-19. "The ALJ should have

5    continued the sequential analysis beyond step two because there was not substantial evidence

6    to show that [Plaintiff's] claim was 'groundless.'" *Webb*, 433 F.3d at 688 (citing *Smolen*, 80

7    F.3d at 1290). As such, the ALJ's dismissal at Step Two was in error, and such error was not

8    harmless.

9                    **B.     *Lay Witness Testimony***

10          Plaintiff argues that the ALJ improperly ignored the testimony of Plaintiff's husband,

11   Victor Browning. Pl.'s Opening Brief (Doc. 25) at 13. "Lay testimony as to a claimant's

12   symptoms or how an impairment affects the claimant's ability to work is competent evidence

13   that the ALJ **must** take into account." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012)

14   (emphasis added) (citations omitted). The Ninth Circuit Court of Appeals has unequivocally

15   stated that "competent lay witness testimony '***cannot*** be disregarded without comment,'

16   *Nguyen* [*v. Chater*], 100 F.3d [1462,] 1467 [(9th Cir. 1996)], and that in order to discount

17   competent lay witness testimony, the ALJ 'must give reasons that are germane to each

18   witness.' *Dodrill* [*v Shalala*], 12 F.3d [915,] 919 [(9th Cir. 1993)]." *Molina*, 674 F.3d at

19   1114 (emphasis in original); *see also Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009).

20          Here, the ALJ did not comment upon Victor Browning's testimony at all. Defendant

21   concedes that "the ALJ should [have] discussed and weighed the husband's testimony at

22   greater length, . . . [but] there is no reason to believe that this would have changed the

23   outcome of the case." Def.'s Response Br. (Doc. 30) at 6. "[W]here the ALJ's error lies in

24   a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing

25   court cannot consider the error harmless unless it can confidently conclude that no reasonable

26   ALJ, when fully crediting the testimony, could have reached a different disability

27   determination." *Molina*, 674 F.3d at 1116 (quoting *Stout v. Comm'r Soc. Sec. Admin.*, 454

28

1  F.3d 1050, 1056 (9th Cir. 2006)).  Despite Defendant's argument to the contrary, the ALJ's

2  failure to discuss Victor Browning's testimony was not harmless.

3        *C.*    *Plaintiff's Credibility*

4       "To determine whether a claimant's testimony regarding subjective pain or symptoms

5  is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 204 F.3d

6  1028, 1035-36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective

7  symptoms 'must produce objective medical evidence of an underlying impairment which

8  could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v.*

9  *Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341,

10  344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Lingenfelter*, 504 F.3d

11  at 1036.  Further, "the claimant need not show that her impairment could reasonably be

12  expected to cause the severity of the symptom she has alleged; she need only show that it

13  could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282

14  (citations omitted).  "Nor must a claimant produce 'objective medical evidence of the pain

15  or fatigue itself, or the severity thereof.' *Garrison v. Colvin*, – F.3d –, 2014 WL 3397218,

16  *15 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test,

17  and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about

18  the severity of her symptoms only by offering specific, clear and convincing reasons for

19  doing so.'" *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281).  "This is not an

20  easy requirement to meet: 'The clear and convincing standard is the most demanding

21  required in Social Security cases.'" *Garrison*, 2014 WL 3397218 at *15 (quoting *Moore v.*

22  *Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

23       "Factors that an ALJ may consider in weighing a claimant's credibility include

24  reputation for truthfulness, inconsistencies in testimony or between testimony and conduct,

25  daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or

26  follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007)

27  (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  The Ninth Circuit Court of

28

Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 2014 WL 3397218 at *17 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals recently noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 2014 WL 3397218 at *18 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at *18 (emphasis in original). Furthermore, a "failure to receive medical treatment during the period that [Plaintiff] had no medical insurance cannot support an adverse credibility finding." *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007). "Although it is within the power of the Secretary to make findings concerning the credibility of a witness and to weigh conflicting evidence, *Rhodes v. Schweiker*, 660 F.2d 722, 724 (9th Cir.1981), [she] cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir.1982)).

Here, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's

1    statements concerning the intensity, persistence and limiting effects of these symptoms are

2    not credible prior to December 27, 2009, to the extent they are inconsistent with finding that

3    the claimant has had no severe impairment or combination of impairments[.]" AR at 17-18.

4    As such, Plaintiff has met the first step.  *See Smolen*, 80 F.3d at 1281-82.  The ALJ further

5    found that:

6         The claimant's medical treatment has been limited to emergency room visits
          for complaints unrelated to her medically determinable impairments. . . . In
7         addition to the objective medical evidence, the claimant's level of functioning
          is inconsistent with her alleged limitations.  The claimant worked in 2006,
8         2008 [sic], and 2008, and she testified that she continued to look for office
          positions. (ALJ hearing; Exhibit 4D, pg. 1).  She was able to take care of her
9         daughter, who was home schooled, and she admitted that she was not
          interested in working because she needed to be there for her daughter. (Exhibit
10        13F, pg. 25).  She was still able to go out socially with her husband as she
          hired a babysitter in August 2009 (ALJ hearing).  She also admitted that she
11        became much worse after the motor vehicle accident.  (Id.)

12   AR at 18.  The ALJ also considered Plaintiff's failure to seek treatment for her mental health

13   issues "well over three years after the date last insured" as negatively impacting Plaintiff's

14   credibility.  *Id.*  Upon reviewing the record as a whole, this Court concludes that the ALJ

15   failed to account for the reasons why Plaintiff did not seek treatment including a lack of

16   insurance and a mistrust of mental health professionals and misstated the record regarding

17   Plaintiff's daily activities.[5]  Moreover, the ALJ cannot rely on isolated statements unless they

18   "constitute examples of a broader development."[6]  *See Garrison*, 2014 WL 3397218 at *18.

19   As such, her credibility determination cannot stand.  Upon remand, the ALJ shall follow the

20   Ninth Circuit mandates in assessing Plaintiff's credibility.

21

22        [5]There is no evidence that Plaintiff "homeschooled" her daughter beyond pre-kindergarten
23   interaction.  Furthermore, the ALJ assumes that because there was a babysitter, Plaintiff and
     her husband went out socially; however, this assumption is not supported by the record.
24

25        [6]The ALJ stated that Plaintiff "admitted that she was not interested in working because she
26   needed to be there for her daughter[;]" however, Plaintiff's husband testified that "[t]he most hours
     that she could do on any kind of a reliable basis, I guess you could say, would be 15 hours a week,
27   which didn't even cover the daycare that was needed for our daughter to be – for her to be able to
     work." AR at 965.

28
                                                    - 20 -

1

### D.    *Medical Records, Treating Physicians and Vocational Expert Testimony*

2
3
4
5
6

In light of this Court's finding that the ALJ erred in her finding of non-severity regarding Plaintiff's MHE, depression, bipolar disorder, and asthma at step two, as well as her failure to properly assess the lay witness testimony and Plaintiff's credibility, the Court directs the ALJ to reassess Plaintiff's pre-December 27, 2009 medical records in their entirety, and if necessary call a vocational expert to testify at any re-hearing.

7

### E.    *Remand for Further Proceedings*

8
9
10
11
12
13

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke*, 379 F.3d at 593 (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

14
15
16

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

17
18
19
20

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

21
22
23
24
25
26
27

Here, the ALJ erred in finding "that the medical evidence clearly established [Plaintiff's] lack of a medically severe impairment or combination of impairments." *Webb*, 433 F.3d at 688. In light of the ALJ's dismissal at step two, issues remain regarding Plaintiff's residual functional capacity and her ability to perform other work existing in significant numbers in the national economy. Moreover, although Plaintiff's MHE, asthma, and mental health disorders may be considered severe, this Court offers no opinion as to whether Plaintiff is disabled within the meaning of the Act. The ALJ is required to consider

28

all of Plaintiff's limitations in her assessment on remand.  SSR 86–8p, 1996 WL 374184, at *5 (S.S.A.1996) ("In assessing RFC, the adjudicator must consider limitations imposed by all of an individual's impairments, even those that are not 'severe.'").

## V.    CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision, including additional hearing testimony, if necessary.

Accordingly, IT IS HEREBY ORDERED that:

1)      Plaintiff's Opening Brief (Doc. 25) is GRANTED;

2)      The Commissioner's decision is REVERSED and REMANDED;

3)      Upon remand, the Appeals Council will remand the case back to an ALJ with instructions to issue a new decision regarding Plaintiff's eligibility for disability insurance benefits prior to December 27, 2009.  The ALJ will give consideration to the lay witness testimony, give further consideration to all of the pre-December 27, 2009 medical records, reassess Plaintiff's credibility in light of Ninth Circuit precedent, and call a vocational expert to testify at any re-hearing, if necessary.

4)      The Clerk of the Court shall enter judgment, and close its file in this matter.

DATED this 29th day of September, 2014.

_____
Bruce G. Macdonald
United States Magistrate Judge

- 22 -